UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LOUIS S. FINE and PATRICIA
FINE,

         Plaintiffs,

    v.

CITY OF MARGATE, ATLANTIC
COUNTY, JOHN DOES #1-10
(fictitious); ABC CORPORATIONS
#1-10 (fictitious); XYZ
PARTNERSHIPS #1-10
(fictitious),

         Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 12-2263
(JEI/AMD)

**OPINION**

**APPEARANCES**:

FINE AND STAUD LLP
By:  Feeda R. Musitief, Esq.
1333 Race Street
Philadelphia, PA 19107
    Counsel for Plaintiffs Luis and Patricia Fine

GEMMEL, TODD & MERENICH, P.A.
By:  Robert P. Merenich, Esq.
767 Shore Road
P.O. BOX 296
Linwood, New Jersey 08221
    Counsel for Defendant, City of Margate

**IRENAS**, Senior District Judge:

    Plaintiffs Louis S. Fine and Patricia Fine bring this

diversity action for damages resulting from Mr. Fine's fall on a

beach access ramp in Margate City, New Jersey.

1

Currently pending before the Court is Defendant City of Margate's Motion for Summary Judgment.  For the reasons explained herein, the motion will be **DENIED**.

I.

The Court recites those facts relevant to deciding the pending motion for summary judgment and resolves any disputed facts or inferences in favor of Plaintiffs, the nonmoving party.

On August 22, 2010, while descending the South Delavan Avenue wooden access ramp from the beach in Margate, New Jersey, Plaintiff Louis S. Fine, 81 years old, slipped and fell. (Plaintiffs' Counter Statement of Facts ("P.C.S.F.") ¶ 22)  Mr. Fine, who was barefoot at the time, kept to one side of the ramp and intended to step off onto the street before reaching the bottom in order to avoid dirty water pooling at the base of the ramp.  (Deposition of Louis S. Fine ("L. Fine Dep.") at 30:20-32:19)  Mr. Fine stated in his deposition that the ramp was slippery and that some of its boards were broken.  (Id.)  As Mr. Fine descended, one of his feet hit a nail jutting out of the ramp and began bleeding.  (Id. at 33:5-17)  Mr. Fine saw "a lot of" other nail heads sticking out and, in his attempt to avoid hitting another popped nail, he slipped.  (Id. at 34:23-35:10)

The South Delevan Avenue access ramp was built around 1962-1963 by the Army Corps of Engineers.  (Def. Answers to Interrog. at 2)  The city constructed the ramp to allow maintenance

vehicles to access the beach, but thousands of pedestrians use the ramp daily to access the beach during the summer. (Deposition of Frank Ricciotti ("Ricciotti Dep.") at 14:1-4, 17:19-18:22)  According to Plaintiff's expert, James C. Druecker, P.E., a consulting civil engineer who examined the ramp on May 23, 2012, the ramp's slope ranges from 14.4% to 17.7% and its surface consists of wood boards placed in a diagonal orientation.  (Preliminary Report of James C. Druecker, P.E. ("Druecker Rep.") at 1)  There is a wood retaining wall on the north side of the ramp and the south side is left open. (Id.)  Though there used to be a handrail on the north side of the ramp in prior years, there were no handrails on the ramp in August 2010.  (Deposition of Edward Navlen ("Navlen Dep.") at 10:19-11:5)  A sign at the base of the ramp stated "BEACH VEHICLE ACCESS - KEEP CLEAR" (Defendant's Motion for Summary Judgment ("D.M.S.J.") at Ex. E), but no sign explicitly prohibited pedestrian use of the ramp. (P.C.S.F. ¶ 5).  In August 2010, the South Delevan ramp provided the only means to access to the beach directly from South Delevan Avenue. (P.C.S.F. ¶ 1).

The ramp is owned and controlled by the City of Margate, and maintained by Margate Public Works, a division of the City of Margate.  (Def. Answers to Interrog. at 2; Ricciotti Dep. at 15:6-16:1)  Frank Ricciotti, the Director of Margate Public

Works, conducts seasonal inspections of the ramp, and inspected it in June 2010. (Ricciotti Dep. at 19:12-20:3) Mr. Ricciotti also uses the ramp daily and, when he does so, makes "visual inspections from [his] vehicle." (Id. at 20:5-6) Further, other employees of the City of Margate walk and drive over the ramp on a daily basis. (Id. at 16:14-17:9)

In his deposition, Mr. Ricciotti stated that if he knew of any nails protruding from the ramp's surface, he would "definitely send somebody out to maintain them nails." (Id. at 39:13-18) Mr. Ricciotti also stated that, "as far as pedestrians," he would "definitely be concerned" about their safety if there were popped nails on the ramp. (Id. at 40:7-14) He stated that popped nails would not have been acceptable back in August 2010. (Id. at 40:15-17) Mr. Ricciotti was aware that water could pond at the base of the ramp before August 2010, but that was not a concern because "it never seemed to be a problem before." (Ricciotti Dep. at 42:3-43:6)

On the day he fell, Mr. Fine believes he saw more than ten nail heads protruding at various heights from the ramp's wooden planks.[1] (L. Fine Dep. at 35:4-17) Other City of Margate residents had seen nails popping out of the ramp before Mr. Fine

---

[1] Plaintiffs do not have any pictures of the ramp from the day Mr. Fine fell, so the description of the ramp that day relies entirely on Mr. Fine's testimony.

fell as well.  Melvin Lapin, who lives on South Delavan Avenue
year-round, stated in his deposition that the ramp is "just not
maintained" and that there have been times when he has "hammered
down 50 or 60 nails" himself during the middle of the summer.[2]
(Deposition of Melvin Lapin ("Lapin Dep.") at 17:14-19)  Edward
Navlen, who also lives on South Delavan Avenue, stated in his
deposition that he fell once when he tried to avoid nails while
descending the ramp.[3]  (Navlen Dep. at 12:11-13:2)  Mr. Navlen
said that the ramp was "just horrible" in August 2010 and that
it looked "like it was falling apart."  (Id. at 26:18-27:2)

Neither Mr. Fine, Mr. Lapin, nor Mr. Navlen ever complained
to City of Margate officials about the nails protruding from the
ramp or the water pooling at the base of the ramp.  (L. Fine
Dep. at 18:12-16; Lapin Dep. at 15:7-12; Navlen Dep. at 18:22-
25)  Mr. Ricciotti stated in his deposition that he was not
aware of any other complaints about the ramp prior to August
2010.  (Ricciotti Dep. at 22:17-23:15)

Plaintiff's expert James C. Druecker concluded that the
ramp is too steep for pedestrian use, that its surface does not
have slip-resistant treatment, and that there is improper
drainage at the lower portion of the ramp.  (Druecker Rep. at 3-

---

[2] Mr. Lapin did not specify the year in which he had to hammer in these nails.
[3] Mr. Navlen stated that this incident occurred around four years prior to his
June 21, 2013 deposition.

4)  Mr. Druecker also found that there did not appear to be a physical reason for Defendant's not providing a handrail and guard, and a slip-resistant surface.  (Id. at 4)

As a result of his fall on August 22, 2010, Mr. Fine suffered a left quadriceps tendon rupture, a common peroneal nerve injury, a medial meniscal tear, and an aggravation of degenerative changes to his knee.  (Expert Report of Richard J. Levenberg, MD ("Levenberg Rep.")  Mr. Fine underwent surgery to repair his left quadriceps tendon within ten days of the incident, and engaged in months of physical therapy thereafter. (Id.)  Mr. Fine was confined to a wheelchair after the operation, but progressed to a walker and then a cane, and now walks without an assistive device.  (Expert Report of Ronald L. Gerson, MD, FAAOS ("Gerson Rep.") at 1)

Since his fall, Mr. Fine has experienced numbness below his left knee, pain in his left foot and knee, and decreased mobility.  (L. Fine Dep. at 120:24-121:12; Levenberg Rep. at 1) Mr. Fine walks with an altered gait and a dropped foot. (Plaintiff's Responses to Defendant's Statement of Facts ("P.R.D.S.F.") ¶ 54)  He claims to be less physically active than he was before the incident.  (Gerson Rep. at 6)  Although Mr. Fine stated in his February 1, 2013 deposition that he was able to play golf again after the incident, he has since given up golf.  (L. Fine Dep. at 85:23-25; P.R.D.S.F. ¶ 53)

Plaintiff's medical expert Dr. Richard J. Levenberg has referred to Mr. Fine's injuries as "serious and permanent." (Levenberg Rep. at 4)  Mr. Fine's left leg buckles occasionally due to his meniscal tear, which might require additional surgery in the future.  (Id.)  According to Dr. Levenberg, Mr. Fine's injuries have caused a combined 28% whole person impairment. (Id.)  The surgery on Mr. Fine's quadriceps tendon also resulted in a six-inch scar on his left knee.  (L. Fine Dep. at 99:24-101:5)

Mr. Fine's claimed out-of-pocket medical expenses since the incident have been $81,678.65.  (P.C.S.F. ¶ 34)  He also has a Medicare Lien of $24,904.96.  (Id.)

Plaintiffs Mr. and Mrs. Fine brought negligence claims against Defendant seeking damages for the injuries Mr. Fine suffered as a result of his fall and compensation for Mrs. Fine's loss of consortium.  The City of Margate presently moves for summary judgment.

## II.

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

7

judgment as a matter of law." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of establishing that no genuine issue of material fact remains.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  *See Anderson*, 477 U.S. at 252.

The nonmoving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). The court's role in deciding the merits of a summary judgment motion is to determine whether there is a genuine issue for trial, not to determine the credibility of the evidence or the truth of the matter.  *Anderson*, 477 U.S. at 249.

## III.

Defendants move for summary judgment on two grounds: (1) Plaintiffs have not presented facts sufficient to sustain Defendant's liability under the New Jersey Tort Claims Act

("Tort Claims Act" or "the Act"), and (2) Plaintiffs failed to demonstrate that Mr. Fine's injuries rise to the threshold level required for compensation under the Act.[4]

This Court will address the merits of Plaintiffs' Tort Claims Act claim before turning to Mr. Fine's injuries.

## A.

The New Jersey Tort Claims Act governs the liability of public entities for alleged dangerous conditions of public lands.  Specifically, the Act provides that:

> [a] public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
>> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>>
>> b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to

---

[4] Defendant does not challenge, and this Court will not address, the viability of Mrs. Fine's claim for loss of consortium.

protect against the condition or the failure to take such action was not palpably unreasonable.

New Jersey Statutes Annotated ("N.J.S.A.") § 59:4-2.

Defendant argues that, construing all facts and inferences in favor of Plaintiffs, a reasonable jury could not find that: (1) the South Delavan ramp was in a dangerous condition when Mr. Fine fell, (2) Defendant had actual or constructive notice of a dangerous condition, or (3) Defendant's action or inaction with respect to the South Delavan ramp was palpably unreasonable.

The Court addresses each of these issues in turn.

**1.**

To establish liability under the Tort Claims Act, a plaintiff must first show that there was a dangerous condition when the complained of injury occurred. N.J.S.A. § 59:4-2. "Dangerous condition" is defined as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *Id.* § 59:4-1(a). "Whether property is in a "dangerous condition" is generally a question for the finder in fact." *Vincitore ex rel. Vincitore v. New Jersey Sports and Exposition Authority*, 169 N.J. 119, 123 (2001).

10

As a threshold matter, this Court considers whether Mr. Fine used the relevant public property "with due care" and in a "reasonably foreseeable manner." *See Garrison v. Township of Middleton*, 154 N.J. 282, 291 (1998) ("[P]roof of a plaintiff's due care, like proof of the physical condition of property, is a threshold requirement").  A plaintiff uses the relevant property "with due care" if that plaintiff's conduct is "objectively reasonable from the community perspective." *Id.* at 291.  In *Garrison*, the Supreme Court of New Jersey held that touch football on a "poorly-lit uneven railroad-station parking lot" constituted a use of public property without due care.  *Id.* at 293.  Since the record "d[id] not establish that the declivity was dangerous to all foreseeable users of the parking lot," i.e. persons who parked their cars in or walked through the lot to the station, the property was not in a dangerous condition.  *Id.*

In the present case, there are sufficient facts for a reasonable jury to find that Plaintiffs used the South Delavan ramp in a reasonably foreseeable manner and with due care. Defendant asks this Court to evaluate the ramp as a roadway for beach vehicles only, not a pedestrian walkway.  (D.M.S.J. at 10) It points to a sign at the base of the ramp that stated "BEACH VEHICLE ACCESS – KEEP CLEAR."  (D.M.S.J. at Ex. E)  But, while the intended use of the ramp may have been a means of beach vehicle access, the reality is, and Defendant's witnesses have

11

acknowledged, that many of Defendant's residents and visitors
used the ramp as a walkway on a daily basis.  (Ricciotti Dep.
17:19-18:22)  There was no sign explicitly prohibiting
pedestrians from using the walkway and Mr. Ricciotti,
Defendant's Director of Public Works, stated in his deposition
that he never told anyone not to walk on the ramp.  (Id. at
19:5-11)  Unlike the late-night game of touch football in
*Garrison*, Plaintiff's barefoot walk across the ramp on a summer
afternoon in August 2010 was in line with how thousands of
others had used the ramp and thus objectively reasonable from
the community perspective.  A reasonable factfinder could
conclude on this record that Mr. Fine's use of the ramp was both
"reasonably foreseeable" and conducted "with due care."

Next, the Court turns to whether the ramp created a
"substantial risk of injury" when used in this manner.

To create a "substantial risk of injury," a defective
condition of property cannot be "minor, trivial, or
insignificant."  *Polyard v. Terry*, 160 N.J. Super. 497, 508
(App. Div. 1998).[5]  "Pedestrians must expect some areas of
imperfection on walkway surfaces, and not every defect in a
walkway surface is actionable."  *Charney v. City of Wildwood*,
732 F. Supp. 2d 448, 456 (D.N.J. 2010).  In *Charney*, the court

---

[5] *Aff'd o.b.,* 79 N.J. 547 (1979), *overruling on other grounds recognized in
Piren v. City of Trenton,* 2009 WL 2168319, at *3 (App. Div. July 22, 2009).

12

held that small hole in the Wildwood boardwalk measuring one and one-half inch deep, and one and one-quarter inch wide was a "minor defect" that did not qualify as a dangerous condition. *Id.*

The undersigned concluded in a prior Tort Claims Act case that a nail protruding one-quarter of an inch from a boardwalk in Ocean City did not present a substantial risk of injury as a matter of law. *Mendelsohn v. City of Ocean City*, No. 02-cv-5390 (JEI), 2004 WL 2314819, at *3 (D.N.J. Oct. 12, 2004). This Court noted that the cases in which prior courts have found dangerous conditions involved "larger and more significant" defects. *Id.* at *5.

Other courts considering small holes, cracks, protrusions, and height deviations have come to the same conclusion. *See McCleary v. City of Wildwood*, No. 09-cv-2876 (RMB) 2011 WL 1630822, at *6 (D.N.J. Apr. 29, 2011) (finding that a surface gap of indeterminable size between the wood and cement sections of a boardwalk was not a condition giving rise to a substantial risk of injury); *McCarthy v. Verona*, No. A-2210-99T2, 2001 WL 1917169, at *2 (N.J. Super. Ct. App. Div. Apr. 16, 2001) (finding no substantial risk of injury on a public sidewalk where there was a slight gap between concrete slabs and one slab was raised one and one-quarter inch above the other because "[s]uch minor irregularities are common place on sidewalks");

13

*Polyard*, 160 N.J. Super. at 509 (finding a three-eighths inch differential in height where a road connected to a bridge not to be a "dangerous condition" because "[t]ravelers on highways must expect some declivities and some areas of imperfect surfaces").

However, while a small defect is generally not considered to pose a substantial risk of injury, "the defect cannot be viewed in a vacuum.  Instead, it must be considered together with the anticipated used of the property.'"  *Atalese v. Long Beach Twp.*, 365 N.J. Super. 1, 5 (App. Div. 2003).  Reversing the trial court's grant of summary judgment, the Appellate Division in *Atalese* found that a jury could reasonably determine that a three-quarter inch difference in the level of pavement spanning an entire block of a bike lane created a substantial risk of injury.  *Id.* at 6.  The court emphasized that reasonably foreseeable users of the relevant property included pedestrians and bicyclists.  *Id.; see also Ryan v. Princeton Borough*, No. A-0409-03T2, 2005 WL 1875263, at *2 (N.J. Super. Ct. App. Div. July 11, 2005) ("A rational fact finder could reasonably hold that a [two to three feet wide and three inches deep] hole . . . located in a crosswalk presented an unreasonably dangerous condition to pedestrians using the crosswalk with due care.").

The defects Plaintiffs allege existed on the South Delavan ramp on August 22, 2010, considered in the context of the expected use of the property, rise beyond the "minor defects"

14

prior courts have found not to pose a substantial risk of
injury.  Viewing the record evidence in the light most favorable
to Plaintiffs, on the day of the incident, there were at least
ten nail heads protruding from the ramp, there was dirty water
pooling at the base of the ramp, and the ramp was slippery.  (L.
Fine Dep. at 34:23-35:17)  The ramp's surface did not have slip-
resistant treatment and that there was improper drainage at the
lower portion of the ramp.[6]  (*See* Druecker Rep. at 3-4)  Further,
Defendant's Director of Public Works admitted in his deposition
that protruding nails would present an unacceptable risk to
pedestrians.  (Ricciotti Dep. at 40:7-17)

Defendants argue that Plaintiffs and their neighbors'
continuous use of the ramp to access the beach when other access
opportunities existed belie the contention that the ramp posed a
"substantial risk of injury."  (D.M.S.J. at 4)  This argument is
inapposite.  It is not reasonable to conclude that the ramp did
not pose a substantial risk just because Plaintiffs and their
neighbors had not yet fallen in the months prior to Mr. Fine's
accident.  Finally, the fact that other beach access points
existed does not mean that this particular access point could
not pose a substantial risk of injury when used by pedestrians.

---

[6] Defendants offer no evidence suggesting that the ramp was in any different
condition in August 2010.

If a jury believes Plaintiffs' version of events – that there were numerous protruding nail heads on a steep, slippery ramp used daily by barefoot pedestrians as a means of accessing the City of Margate's beach – that jury could reasonably conclude that the ramp created a "substantial risk of injury." This is not a case in which a larger walkway surface, like a boardwalk, had one small, isolated area of imperfection.  To the contrary, the ramp had a more limited surface area on which pedestrians could navigate the popped nails and the added inherent risk of a sloped, slippery surface.[7]  In a sense, pedestrians were forced to confront the various hazards each time they traversed the ramp.  While each hazard alone might not satisfy the standard under the Tort Claims Act, a reasonable jury could determine that the combination of the South Delavan ramp's popped nails and steep, slippery surface on August 22, 2010 presented a substantial risk of injury.

---

[7] This Court does not find that the slope of the ramp itself might have constituted a dangerous condition, as the original design of the ramp would likely be protected under the plan-or-design immunity granted under the Tort Claims Act, which provides that:

> [n]either the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.

N.J.S.A. § 59:4-6.  However, the popped nails and slippery surface must be evaluated in the context of ramp's design.

The Court now turns to whether Defendant had actual or constructive notice of the dangerous condition of the South Delavan ramp on August 22, 2010.[8]

## 2.

A public entity has actual notice of a dangerous condition "if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. § 59:4-3.

If a public entity did not have actual notice of a dangerous condition, it will be liable "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous characters." *Id*. at § 59:4-3(b). "[T]he mere existence of an alleged dangerous condition is not constructive notice of it." *Polzo v. County of Essex*, 196 N.J. 569, 581 (2008) (internal quotations omitted) (citing *Sims v. City of Newark*, 244 N.J. Super. 32, 42 (Law Div. 1990)).

There is no disputing that Defendant was aware that water tended to pool at the base of the South Delavan ramp.

---

[8] Plaintiffs do not present any facts in their opposition papers and do not argue, under N.J.S.A. § 59:4-2(a), that Defendant's negligent act or omission affirmatively created the relevant dangerous condition on the ramp.  The Court will not address this prong of the Tort Claims Act.

(Ricciotti Dep. at 42:3-12)  The issue is thus whether Defendant should have known the dangerous character of the pooling water. In his deposition, Mr. Ricciotti stated that the pooling water "never seemed to be a problem before." (Id. at 43:2-6)  Yet, while there is neither evidence that Defendant received complaints that the pooling water made the ramp slippery nor evidence that others had slipped on the ramp prior to Mr. Fine's incident in August 2010, Defendant's Director of Public Works stated that he was not aware that records of past complaints would even be kept.  (Ricciotti Dep. at 22:17-23:9)  It would not be unreasonable to conclude that the bottom of the South Delavan ramp, with water pooling there, would be slippery, which would pose a danger to the pedestrians Defendant knew to use the ramp.  On this record, a jury could find that Defendant, having actual knowledge of the tendency of water to pool at the base of the ramp, should have known of that danger.

Plaintiffs argue that Defendant also had either actual or constructive notice of the nails protruding from the ramp's surface.  Plaintiffs contend that the varying heights of numerous protruding nails on August 22, 2010, indicate that the nails were exposed for a long period of time.[9]  (P.R.D.S.F. ¶ 9) Further, Plaintiffs offer the deposition testimony of Mr. Lapin,

---

[9] Mr. Fine did specify how high the nails were, only that they were at varying heights (L. Fine Dep. at 36:4-8)

who claimed to have hammered in fifty to sixty nails on the ramp during one summer and tripped on exposed nails numerous times (Lapin Dep. at 17:14-18:19), and Mr. Navlen, who claimed he fell after tripping on a nail on the ramp a year or two before Mr. Fine's fall (Naveln Dep. at 12:11-13:2).  Since City of Margate employees, including Mr. Ricciotti, performed seasonal inspections of the ramp and used the ramp on a daily basis, Plaintiffs assert that Defendant must have been aware of these dangerously popped nails, belying Mr. Ricciotti's statement that he was not aware of any popped nails prior to August 22, 2010.

If Defendant did not have actual notice of the nails, Plaintiffs contend that Defendant was on constructive notice, as the heights of the nails indicate that the nails were exposed for a long enough period of time that Mr. Ricciotti or other of Defendant's employees should have discovered them, and were obvious to anyone traversing the ramp.

Arguing that there was no actual notice of the popped nails, Defendant points to the fact that Mr. Ricciotti did not find any nails protruding from the ramp's surface, something he looked for specifically, during his June 2010 inspection. (Ricciotti Dep. at 19:20-20:3; 36:8-16)  Mr. Ricciotti also drove over the ramp multiple times each week and conducted visual inspections from his vehicle, but did not see protruding nails.  (Id. at 34:19-35:2)  Finally, Defendant was not aware of

19

any complaints prior to August 22, 2010, that there were popped
nails on the ramp.  (Id. at 22:17-21; Def. Answers to Interrog.
at 5)

Defendant offers similar evidence in arguing that a
reasonable jury could not find that the City of Margate was on
constructive notice of the popped nails.  Defendant claims that
nail heads could not have protruded long enough or been obvious
enough if Mr. Ricciotti, who was concerned about popped nails on
the ramp, never found any in his June 2010 seasonal inspection
and later vehicle inspections.

Drawing all inferences in Plaintiff's favor, this Court
holds that there is sufficient evidence upon which a reasonable
jury could conclude that Defendant had either actual or
constructive notice of the popped nails.  There are genuine
factual disputes both as to whether there were nails protruding
from the ramp and how long those nails were in that state.
Although Defendant claims to have been aware of no prior
complaints about popped nails on the South Delavan ramp, Mr.
Ricciotti stated that he was not aware that records of such
complaints would even be kept.  Neither did Mr. Ricciotti keep
records of his own inspections of the ramp.  The deposition
testimony of Mr. Navlen and Mr. Lapin, who claimed to have seen
multiple nails protruding from the ramp's surface over the years
prior to Mr. Fine's fall, calls into question Mr. Ricciotti's

testimony that he was not aware of any prior issues related to nails on the ramp.  It is for the jury to determine the credibility of Mr. Ricciotti's testimony regarding his June 2010 seasonal inspection, which found no popped nails, and his informal inspections thereafter.  So too it is for the jury to determine the credibility of Mr. Fine's claim that numerous nails protruded at varying heights on the day he fell and whether that indicates that the nail heads were exposed for a long period of time.

For the same reasons stated above in the "dangerous condition" discussion, if a jury finds that Defendant knew or should have known about the ramp's popped nails, the jury could reasonably conclude that Defendant should have known the dangerous character of those nails.  *See* supra § III.A.1.

Since a reasonable jury could find that Defendant had actual notice and constructive notice of the various defects creating a dangerous condition on the South Delavan ramp, this Court turns to whether Defendant's failure to cure these defects was palpably unreasonable.

### 3.

The Tort Claims Act places one final restriction on abrogating municipal immunity:  Plaintiffs must establish that the action Defendant took to protect against the dangerous

21

condition of the ramp, or Defendant's failure to protect against the condition, was palpably unreasonable.  N.J.S.A. § 59:4-2.

Although "palpably unreasonable" is not defined in the Tort Claims Act, the Supreme Court of New Jersey has interpreted the term to mean "more than ordinary negligence," and impose "a steep burden on a plaintiff." *Coyne v. State Dept. of Transp.*, 182 N.J. 481, 493 (2005).  The standard "'implies behavior that is patently unacceptable under any given circumstances' and 'it must be manifest and obvious that no prudent person would approve of its course of action or inaction.'" *Id.* (quoting *Kolitch v. Lindedahl*, 100 N.J. 485, 493 (1985)).  The Third Circuit has stated that "[i]n order to be palpably unreasonable under New Jersey law, actions must be the result of 'capricious, arbitrary, whimsical or outrageous decisions of public servants.'" *Waldorf v. Shuta*, 896 F.2d 723, 738 (3d Cir. 1990) (quoting *Williams v. Phillipsburg*, 171 N.J. Super. 278, 408 A.2d 827, 831 (App. Div. 1979).

In considering whether a public entity's actions were "palpably unreasonable," one must consider "not only what was done," but the entity's "motivating concerns." *Schwartz v. Jordan*, 337 N.J. Super. 550, 563 (App. Div. 2001).  "Simply put, the greater the risk of danger known by the Township and sought to be remedied, the greater the need for urgency." *Id.*  Other factors include the cost and difficulty of more prudent action

22

on the public entity's behalf. *Mendelsohn*, 2004 WL 2314819, at *7. Courts determining liability under the Tort Claims Act have generally found the failure to repair small surface defects not to be palpably unreasonable where public entities conducted frequent safety inspections and were not aware of any prior incidents. *See id.*

In *Mendelsohn*, this Court found that the defendant's failure to repair a popped nail on the boardwalk was not palpably unreasonable, but "simply not enough to prevent [plaintiff's] injuries." *Mendelsohn*, 2004 WL 2314819, at *8. The defendant municipality in that case had conducted a safety inspection of the relevant area four to six times per month, including an inspection two weeks prior to the plaintiff's accident when employees hammered down protruding nails they had found. *Id.* at *7. This Court also noted that the defendant municipality was not aware of any prior serious accidents due to the alleged condition. *Id.* (citing *Schwartz*, 337 N.J. Super. 550). *See also McCleary*, 2011 WL 1630822, at *8-9 (finding Defendant's failure to repair an uneven area of boardwalk not to be palpably unreasonable when Defendant had conducted daily inspections and repairs of the boardwalk, and had not received prior reports of defects and failed to respond); *Cascone v. Borough of Belmar*, No. L-3581-07, 2009 WL 5084091, at *2-3 (N.J. Super. Ct. App. Div. Dec. 29, 2009) (upholding summary judgment

for the defendant municipality where the trial court concluded that failing to repair a raised nail and board on a boardwalk was not palpably unreasonable when the relevant area was inspected on a weekly basis).

On the other side of the spectrum, courts have found a defendant's conduct to be palpably unreasonable when faced with clearly irresponsible and inadequate measures taken by municipalities confronting serious dangers on public property. In *Vincitore v. New Jersey Sports & Exposition Authority*, the Supreme Court of New Jersey held that the defendant's not placing guards to operate a railroad crossing gate was palpably unreasonable after the plaintiff's decedent was killed on the tracks by an oncoming train after driving through the open gate. 169 N.J. at 130.

In *Schwartz v. Jordan*, the Appellate Division held that the trial court improperly excluded evidence of prior accidents resulting in serious injury and death that had occurred in the same poorly lit cross-walk where the plaintiff had been struck by a vehicle. 337 N.J. Super. at 563. The court found that this excluded evidence, along with the fact that the defendant township had not installed new street lamps that would have provided better lighting in the area, presented a jury question as to whether the defendant's actions were palpably unreasonable. *Id.*

24

Plaintiffs argue that Defendant's actions, or lack thereof, were palpably unreasonable for the following reasons:  Defendant knew that pedestrians used the ramp every day during the summer; Defendant's employees were present on the ramp daily and thus aware of the ramp's slope, lack of anti-slip material, and lack of handrails; ramps nearby had handrails; Defendant knew that water tended to pool at the base of the ramp; Defendant inspected the ramp seasonally and used the ramp daily, yet did nothing to resolve the pooling water or nails protruding from the ramp; the ramp was so obviously in bad shape for so long that other residents had to make repairs on their own; Defendant's occasional vehicle inspections of the ramp were not sufficient to find popped nails or determine how slick the surface of the ramp might be; and more frequent and thorough inspections of the ramp by Defendant's employees would not have been costly or difficult.

Defendant argues that it never received any report or complaint regarding the allegedly dangerous condition of the ramp, that there is no record of prior accidents in the area, that there were numerous other beach access ramps nearby meant for pedestrians, and that Plaintiff, along with other City of Margate residents, had traversed the ramp hundreds of times prior to the incident.  These facts, Defendants contend, counter any suggestion that the ramp "was so terrible that the City of

25

Margate's failure to remedy the ramp rises to the level of palpable unreasonableness." (D.M.S.J. at 14).

Having concluded that a reasonable jury could determine both that the South Delavan ramp was in a dangerous condition on August 22, 2010, and that Defendant knew or should have known about the dangerous condition, this Court holds that a reasonable jury could also find that Defendant's failure to repair that dangerous condition was palpably unreasonable.

This Court recognizes the principle underlying the Tort Claims Act that "immunity from tort liability is the general rule and liability is the exception." *Garrison*, 154 N.J. at 286 (citing *Bombace v. City of Newark*, 125 N.J. 361, 372 (1991). However, a municipality's failure to hammer in protruding nails on a slippery and steep beach access ramp that barefoot pedestrians, young and old, traversed on a daily basis could rise to the level of patent unacceptability required under the Act.

This is not like *Mendelsohn*, where the defendant had inspected the relevant boardwalk four to six times each month, or *McCleary*, where the defendant conducted daily inspections of the boardwalk at issue.[10]  Here, Mr. Ricciotti conducted his last proper inspection of the South Delavan ramp in June 2010, the

---

[10] The Court notes that in neither of these cases were the relevant defects found to be "dangerous conditions" in the first place.

26

very beginning of the summer season.  A jury could find that Defendant should have required Mr. Ricciotti to make formal inspections of the forty year-old ramp more frequently during the summer months, when Defendant knew pedestrians would use the ramp every day to enter and exit the beach.  Simply put, Defendant cannot hide behind the "BEACH VEHICLE ACCESS - KEEP CLEAR" sign.  Since Defendant knew that pedestrians used the South Delavan ramp, and never took any steps to prevent pedestrians from using the ramp, a reasonable jury could determine that Defendant was palpably unreasonable in its meagre efforts to eliminate what would be a clear danger to every pedestrian who used the ramp.

Having found that genuine issues of material fact exist as to whether Defendant is liable under the Tort Claims Act for Mr. Fine's injuries, this Court will now address whether Mr. Fine's injuries rise to the threshold level for compensation under N.J.S.A. § 59:9-2(d).


### B.

The Tort Claims Act limits the award of damages against a public entity for pain and suffering resulting from an injury to cases of "permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00."  N.J.S.A. § 59:9-2(d).

The Supreme Court of New Jersey has outlined a two-pronged test for recovery under the Act: a plaintiff must show "(1) an objective permanent injury, and (2) a permanent loss of bodily function that is substantial." *Gilhooley v. Cnty. of Union*, 164 N.J. 533, 541 (2000).

Plaintiffs clearly satisfy the first prong of the *Gilhooley* test.  Both Plaintiffs' and Defendant's medical experts have concluded that Mr. Fine suffered multiple objective permanent injuries resulting from his fall on the South Delavan ramp. (*See* Levenberg Rep. at 4; Gerson Rep. at 12).  Specifically, both stated that the rupture of Mr. Fine's quadriceps tendon and the meniscal tear are permanent.[11]  (Levenberg Rep. at 4; Gerson Rep. at 12)

As to the second prong, there is no *per se* rule as to what constitutes an injury that is "substantial" under the Tort Claims Act.  *Knowles v. Mantua Twp. Soccer Ass'n*, 176 N.J. 324, 331 (2003).  Determining whether a plaintiff may recover under the Act is a "fact-sensitive analysis."  *Id*.  Prior cases have provided some guidance.

The statutory standard has been met in the following circumstances: (1) "pins, wires, mechanisms and devices are required to make the plaintiff normal," *Gilhooley*, 164 N.J. at

---

[11] Dr. Levenberg also concluded that Mr. Fine's peroneal nerve injury was permanent.  (Levenberg Rep. at 4)

542-43; (2) injuries causing "blindness, disabling tremors, paralysis, and loss of smell," Id. at 541; (3) a severe rotator cuff tear requiring surgical repair that resulted in a forty-percent reduction of range of motion in plaintiff's arm, *Kahrar v. Borough of Wallington*, 171 N.J. 3, 15-16 (2002); and (4) a disc herniation resulting in the "lack of feeling in [plaintiff's] left leg and the inability to stand, sit, or walk comfortably for a substantial amount of time, engage in athletics, and complete household chores," *Knowles*, 176 N.J. at 333.  In these cases, the Supreme Court of New Jersey "declined to adopt the ability to work as a litmus test for recovery." *Id*. "Damages will not be defeated merely because [a plaintiff] can perform some routine functions almost as well as she could prior to her injury."  *Kahrar*, 171 N.J. at 14-15.

On the other hand, summary judgment in favor of defendant public entities has been appropriate where (1) plaintiffs presented no evidence of limitations or impairments in range of motion or ambulation, or instability, *Ponte v. Overeem*, 171 N.J. 46, 54 (2002)); (2) lingering pain from injuries, which the court described as "subjective feelings of discomfort," lessened the plaintiff's ability to perform certain tasks, *Knowles*, 176 N.J. at 332; and (3) plaintiff experienced some restriction of movement in her neck after suffering a herniated disc, but did not miss a day of work, and continued to play sports and do

household chores, *Heenan v. Greene*, 355 N.J. Super. 162 (App.
Div. 2002).  In *Heenan*, the Appellate Division distinguished the
plaintiff's injury, for which she received only "conservative
treatment," from the aggravated injuries in *Gilhooley* and
*Kahrar*, where plaintiffs "sustained injuries that would have
rendered an extremity useless without significant surgical
intervention."  355 N.J. Super. at 167.

Plaintiffs here have presented evidence sufficient for a
reasonable jury to conclude that Mr. Fine's injuries are
substantial.  Defendant argues that Mr. Fine recovered from his
injuries to such an extent that they have had no substantial
impact on his body.  Defendant points to progress notes prepared
by Mr. Fine's treating physician in December 2010 and August
2011 that state Mr. Fine was doing "very well."  (Defendant's
Response to Plaintiffs' Opposition ("D.R.P.O.") at 7)  Defendant
also states, albeit admitting that such evidence is not
dispositive, that Mr. Fine can still drive, work and golf.
(D.M.S.J. at 16).

Yet, the Supreme Court of New Jersey has opined that
"'[w]here plaintiff's medical proofs support a claim of
permanent injury that is based on objective evidence and not
merely on subjective complaints, such evidence raises an issue
for the jury, and removes the case from the realm of summary
judgment.'"  *Knowles,* 176 N.J. at 335 (quoting *Gerber v.*

30

*Springfield Bd. Of Educ.*, 328 N.J. Super. 24, 35 (App. Div. 2000)).

This is not a case in which a plaintiff puts forward only subjective complaints of pain.  It is a close case,[12] but one in which Plaintiffs have offered objective medical evidence of injuries and the serious impact those injuries still have on Mr. Fine's body.  Mr. Fine underwent significant surgical intervention to repair his left knee.  According to Dr. Levenberg, Mr. Fine will continue to have "areas of numbness" and "difficulty with ambulation due to weakness in the foot." (Levenberg Rep. at 4)  In addition, Mr. Fine's leg "continues to buckle due to his meniscal tear." (Id.)  Consulting the American Medical Association Guide to the Evaluation of Permanent Impairment, Dr. Levenberg concludes that Mr. Fine's leg muscle atrophy, combined with motor sensory and dysesthesia to the common peroneal nerve, cause a combined 28% whole person impairment. (Id.)

That Mr. Fine can now walk unassisted and engage in many of the activities in which he used to engage does not mean his injuries are insubstantial as a matter of law.  A reasonable

---

[12] As the Appellate Division has stated, the closeness of a case "counsels that the issue of permanent injury of a substantial nature is one for resolution by a jury." *Osman v. Thomas*, No. L-86-10, 2012 WL 1868329, at *4 (N.J. Super. Ct. App. Div. May 24, 2012).

jury could find his injuries to be substantial.[13]  Summary judgment would thus be inappropriate.

### IV.

For the reasons set forth above, the Court will deny Defendant's Motion for Summary Judgment.  An appropriate Order accompanies this Opinion.

Date: September 26, 2014

s/ Joseph E. Irenas
**JOSEPH E. IRENAS, S.U.S.D.J.**

---

[13] That Defendant's medical expert seems to disagree with Dr. Levenberg's assessment of the impact and seriousness of Mr. Fine's injuries further establishes this question as one for the jury.  (*See* Gerson Rep. at 11-12)